IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AIRCRAFT GEAR CORPORATION ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 02 C 50338 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| CLAYTON S. MARSH and ) | |
| ROPES & GRAY, a partnership ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Before this Court are Defendants' Motion for Summary Judgment, Defendants' Motion to Strike Paragraphs 9 and 10 of Olson's Affidavit, and Counterplaintiffs' Motion for Summary Judgment on Counterclaims I and II. For the reasons set forth in the opinion below, Defendants' Motion for Summary Judgment is denied; Defendants' Motion to Strike is granted; and Counterplaintiffs' Motion for Summary Judgment is denied.

I.      FACTS

The basic facts of this case have been set forth in previous decisions. This Court will assume familiarity with those decisions. For the purposes of this motion, the following undisputed facts are taken from the parties' Local Rule 56.1 statements.

In 1991, Aircraft Gear Corporation ("AGC") entered a fifteen-year fixed price contract ("the contract") with The Boeing Company ("Boeing") to supply transmissions for Boeing's 777 aircraft. AGC manufactured these transmissions at its facility in Chandler, Arizona, which had

opened in 1986 but suffered from the decrease in defense spending during the late 1980s. AGC lost money on the contract. In 1994 and again in 1996, it requested, and received, price increases from Boeing. During the negotiations for the 1996 price increase, Boeing informed AGC that it would not consider any further price increases during the remaining nine years of the contract.

Unfortunately, AGC continued to lose money on the contract. In early 1998, Boeing informed AGC that it was transferring AGC's profitable contract to supply parts for Boeing's 767 aircraft to another vendor. On March 12, 1998, AGC requested another price increase from Boeing on the 777 contract. Boeing denied this request. AGC also requested an early release from the 777 contract. Boeing denied this request as well. In mid-January 1999, Dean Olson, president of AGC, and Arthur O'Day, general manager of AGC's Chandler facility, gave Boeing a presentation on AGC's need for a price increase on the contract, stating that AGC stood to lose over $10 million over the life of the contract if unaltered. AGC again requested either a price increase or an early release from the contract.

At the end of the presentation, Boeing decided to replace AGC on all its contracts, not solely the 777 contract. In February 1999, Boeing notified AGC that it was transferring the contract to Moog and would therefore release AGC from the contract as of December 31, 2000. Olson, AGC's president, was dissatisfied with the termination terms Boeing outlined. In February 1999, O'Day contacted defendant Clayton Marsh, who was then of counsel with defendant Ropes & Gray, to discuss the 777 contract. Marsh already had assisted AGC with other negotiations regarding contracts with Boeing. Marsh cautioned O'Day not to threaten to stop shipments to Boeing because to do so might constitute anticipatory repudiation of the

contract. Marsh further prepared a legal memorandum for AGC along with a draft letter from AGC to Boeing, and sent both items to AGC on March 1, 1999.

On March 12, 1999, AGC's Board of Directors met at the Chandler plant. During that meeting, the Directors discussed the 777 contract. No representative from Ropes & Gray was present at this meeting. Certain board members discussed the possibility of threatening to stop shipment on the contract. At the conclusion of the meeting, O'Day contacted the Chandler facility shipping manager and directed him not to ship any parts to Boeing on the following Monday, March 15, 1999, until he head from Olson. No parts were shipped to Boeing between March 15-18, 1999.

Olson called Boeing on March 15, 1999, and had a conversation about the contract. The contents of this conversation are disputed. Olson states in his affidavit that he understood "from Marsh's prior communication ... that I could not make a direct threat to suspend shipments...." Olson Aff. ¶ 8. The parties dispute whether Marsh and Olson spoke on March 15, 1999. AGC phone records show that a call was placed from AGC's Rockford, Illinois offices to the Ropes & Gray offices in Boston. Marsh states that he recollects receiving a telephone call or a voice mail message from Art O'Day on March 15, 1999, but denies speaking with Olson on that date. Olson contends that he did speak with Marsh. On March 16, 1999, Olson sent a proposed termination agreement to Boeing, who responded with a counter-offer. Boeing employees stated at the trial on the underlying 777 contract dispute that the only reason it offered a price increase was because AGC threatened to stop shipments, which would have jeopardized the entire 777 production line. Marsh reviewed Boeing's proposal on March 19, 1999. The parties agree that Marsh and Olson spoke by telephone about the Boeing counter-offer but dispute the content of

that conversation. The parties agree that Marsh advised Olson that he should accept Boeing's counter-offer but that Olson wanted to negotiate further. On March 19, 1999, Olson faxed AGC's counter-offer to Boeing. The following week, Boeing representatives met with Olson and O'Day at AGC's Chandler facility and made further changes to the Termination Agreement. On March 23, 1999, the parties signed the Termination Agreement, but backdated it to March 19, 1999. Defendants were not present at the March 23 meeting at the Chandler facility and AGC did not consult them about any changes to the Termination Agreement before signing it. AGC then produced and shipped parts to Boeing under the terms of the Termination Agreement for approximately fifteen months.

On June 20, 2000, Boeing notified AGC by letter that it considered the Termination Agreement unenforceable as a result of duress and that it would begin immediately recouping the price increase paid to that point, which totaled $3.2 million. To that end, Boeing stated that it was withholding $125,808 in past due payments and a further $600,000 in payments due on June 23, 2000 for parts that AGC had already shipped to Boeing. In fact, Boeing never made another payment to AGC after June 20, 2000. After receiving this letter, Olson asked O'Day to determine whether it was more economically sensible to continue or to close the Chandler facility. Olson then directed O'Day to assemble transmissions from the existing parts and close the plant.

On June 27, 2000, AGC contacted defendants and asked for their assistance in responding to Boeing's June 20 letter. Between June 28 and July 14, 2000, Marsh drafted three letters from AGC to Boeing regarding Boeing's decision to recoup the 1999 price increase. Boeing continued to state that it was entitled to recoup $3.2 million. On July 18, 2000, AGC

-4-

retained the Lane Powell law firm for a possible lawsuit against Boeing. On July 21, 2000, Boeing faxed a final offer to pay AGC approximately $5.5 million if AGC completed its outstanding contracts. In exchange, AGC would relinquish all claims against Boeing. AGC did not consider this offer to reflect a material alteration in Boeing's position. AGC faxed the offer to Lane Powell on July 21, 2000. The parties dispute whether AGC also sent the offer to Marsh and Ropes & Gray on July 21, 2000, or at any point prior to AGC's decision to file suit against Boeing.

Olson instructed Lane Powell to file suit against Boeing in the United States District Court in Seattle. Lane Powell filed the complaint on July 21, 2000, asserting that it was entitled to recover the disputed price increase and any losses on the remainder of the Boeing contracts through December 2000. Boeing counterclaimed that the Termination Agreement was unenforceable because it was the product of duress. The parties dispute whether AGC decided to retain only Lane Powell during the fall of 2000. In December 2000, the lead attorney for AGC at Lane Powell left the firm. The parties agree that O'Day then asked Ropes & Gray partner Steve Kaufman to become involved in the case again. In the summer of 2001, Lane Powell filed AGC's motion for summary judgment. Also during the summer of 2001, Marsh left Ropes & Gray and formed a solo practice specializing in government contracts.

In August 2001, the District Court in *AGC v. Boeing* granted partial summary judgment in Boeing's favor on cross-motions for summary judgment. The court found that Olson had threatened to stop shipments to Boeing on March 15, 1999, and that this threat was an anticipatory breach of the 777 contract. The court determined, however, that the question of duress was for the jury to decide.

Marsh drafted a memorandum in September 2001, summarizing the events to date and giving an analysis of possible future alternatives. The memorandum concluded "[s]ettlement has become a very attractive means of recovery or limiting losses, in my view." Partners at both Ropes & Gray and Lane Powell advised Olson in the fall of 2001 that the most likely outcome at trial was that Boeing would prevail against AGC on its duress claim. Kaufman, a partner at Ropes & Gray, also stated that he thought the "expected value" of the case was $1.5 million to AGC. Attempts to resolve the case through mediation and settlement discussions failed.

The first trial in *AGC v. Boeing* ended in March 2002 with a hung jury on the issue of duress, although the jury found in favor of AGC on Boeing's claim that the Termination Agreement was a cover contract. Olson told Ropes & Gray and Lane Powell that AGC needed to get back in front of another jury as soon as possible. In June 2002, the case was tried a second time. On June 18, 2002, the second jury found the 1999 price increase to be the product of duress and returned a $1.83 million verdict in Boeing's favor. Olson subsequently agreed to settle the case for approximately $1.6 million.

On July 5, 2002, AGC filed the present suit against Marsh and Ropes & Gray. AGC has withheld $102,000 in payments otherwise due to Ropes & Gray for services relating to the *AGC v. Boeing* litigation. Since the summer of 2002, AGC has withheld $1,500 in payments otherwise due to Marsh for services rendered on matters unrelated to *AGC v. Boeing*.

## II. MOTION TO STRIKE

As a preliminary matter, this Court must address Defendants' Motion To Strike Paragraphs 9 and 10 of Dean Olson's Affidavit. Defendants contend that AGC seeks to avoid summary judgment by submitting a self-serving affidavit by Dean Olson, president of AGC, that

asserts that Olson did not actually threaten Boeing, but rather told Boeing he was "considering" stopping shipments. Defendants argue that the paragraphs of Olson's affidavit containing this assertion should be struck because they conflict with AGC's Amended Complaint in this case; they contradict Olson's admissions under oath in the *AGC v. Boeing* litigation and in his deposition in the instant case that he did threaten Boeing; and they contradict the finding of the Western District of Washington in *AGC v. Boeing* that Olson did threaten Boeing and that the threat constituted anticipatory repudiation.

Principles of issue preclusion and Seventh Circuit case law prevent AGC from avoiding summary judgment by submitting an affidavit that contradicts prior judicial findings, prior judicial admissions or a party's prior sworn testimony. *See Loeb Industries, Inc. v. Sumitomo Corp.*, 306 F.3d 469, 498 (7th Cir. 2001); *Babrocky v. Jewel Food Corp.*, 773 F.2d 857, 861 (7th Cir. 1985); *Lewis v. Henderson*, 249 N.E.2d 958, 962 n.3 (N.D. Ill. 2003).

An examination of the record supports Defendants' contentions. Olson testified in his deposition in the instant litigation that Marsh told him not to threaten to stop shipments. In his deposition testimony in the *AGC v. Boeing* litigation, Olson testified that he "told [Boeing] if [they] didn't come to the table and bargain with us, we were going to withhold shipments.... I told him I was going to withhold shipments, and I had not done that before in my life or ever had a conversation quite like that before in my career." Olson 2001 Dep. at 203-204, 210-11. In an affidavit in the *AGC v. Boeing* litigation, Olson stated that he "threatened to discontinue shipments to Boeing unless they would immediately enter into meaningful discussions about a termination agreement...." Olson 2001 Aff. at ¶ 7. The federal district court in Seattle determined that AGC "threatened to discontinue shipments to Boeing...." *AGC v. Boeing*, No. C00-1233L,

slip op. at 2 (W.D. Wash. Aug. 30, 3001). Finally, AGC's amended complaint in the instant litigation alleges that "AGC's President, Mr. Dean Olson, called Boeing and threatened to discontinue shipments of 777 parts to Boeing...." Pl.'s Am. Compl., ¶ 23.

Judicial admissions are conclusive and "have the effect of withdrawing a fact from contention." *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995). In the Seventh Circuit, a judicial admission includes "formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller*, 58 F.3d at 1199 n.8. Moreover, a plaintiff's "factual assertions in his complaint are binding judicial admissions," *Lewis*, 249 F. Supp. 2d at 962 n.3, and cannot be contradicted by a subsequently filed affidavit. *Id.* For these reasons, this Court grants Defendants' Motion to Strike Paragraphs 9 and 10 of Dean Olson's Affidavit.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue of fact. Such a showing entitles the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Lucas v. Chicago Transit Authority*, 367 F.3d 714, 720 (7th Cir. 2004). A genuine issue of material fact exists only when a reasonable factfinder could find for the nonmoving party, based on the record as a whole. The court does not weigh the evidence and it does not make credibility determinations. Instead, the court makes all reasonable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000); *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000).

## IV. ANALYSIS

To state a claim for legal malpractice under Illinois law, a plaintiff must allege (1) an attorney-client relationship that establishes a duty on the part of the attorney; (2) a breach of that duty by a negligent act or omission; (3) proximate cause establishing that "but-for" the attorney's malpractice, the plaintiff would not have been injured; and (4) actual damages. *See Michael v. Scain, Fursel & Burney, Ltd.*, 332 Ill. App. 3d 618, 620, 773 N.E.2d 1192 (2002).

The parties do not dispute the existence of an attorney-client relationship between AGC and Defendants, nor, it seems, the issue of breach. Defendants, however, contend that their legal advice was not the proximate cause of Plaintiff's inability to enforce the Termination Agreement with Boeing or of Plaintiff's decision to close its Chandler, Arizona facility early. Rather, they assert that AGC ignored and acted counter to their legal advice, thereby causing the damages alleged.

### A. Discovery Rule

At the outset, Defendants argue that Plaintiff's claims arising from Defendants' March 1999 legal advice are barred by the applicable statute of limitations. The parties agree that Illinois law applies to the issues before this Court. Under applicable Illinois law, AGC must have filed its claims within two years from the time that it "knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b). The Illinois statute of limitations contains a "discovery rule," which provides that the limitations period begins to run when the plaintiff knows or reasonably should have known of his injury and knows or reasonably should know that the injury was wrongfully caused. *See Morris v. Margulis*, 197 Ill.2d 28, 35-36, 754 N.E.2d 314 (2001). The date on which a plaintiff discovered that it had

been injured and that such injury was wrongfully caused is generally a question of fact. When, however, it is clear from the undisputed facts in the record that only one conclusion can be drawn, the court may decide the issue. *See Morris*, 197 Ill. 2d at 36, 754 N.E.2d 314. The Illinois Supreme Court has interpreted the words "wrongfully caused" in the Illinois statute to refer to the point when "the injured person becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved. *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 416, 430 N.E.2d 976 (1981).

Defendants argue that AGC was injured on June 20, 2000, when it received Boeing's written notification that the Termination Agreement was unenforceable because it had been obtained through duress, and that Boeing would withhold monies that were past due to AGC. Defendants contend that AGC was injured not later than June 27, 2000, when it began incurring legal expenses relating to advice that Defendants provided in March 1999. Thus, Defendants contend that AGC knew or should have known as of June 20, 2000 (but in any event, not later than June 27, 2000), that it was injured and that its injury may have been wrongfully caused by Defendants' legal advice. Therefore, the statute of limitations on AGC's claims regarding Defendants' March 1999 legal advice would run no later than June 27, 2002. AGC filed its complaint in the instant litigation on July 5, 2002; Defendants contend that its claims should be time barred.

AGC asserts that its claims relating to Defendants' March 1999 legal advice are not barred by the statute of limitations. According to AGC, it did not suffer any injury until its litigation with Boeing in federal court in Washington was resolved. In any event, AGC contends

that it was not clear that it had suffered damages until the Washington judge denied summary judgment to AGC. In support of its position, AGC cites an Illinois state court case that states that "the mere assertion of a contrary claim or the filing of a lawsuit [by a third party] [a]re not, in and of themselves, sufficiently compelling to induce [a] client to seek a second legal opinion." *Lucey v. Pretzel & Stouffer, Chrtd.*, 301 Ill. App. 3d 349, 357-58, 703 N.E.2d 473, 479-80 (1st Dist. 1998). In addition, even assuming that AGC was injured on June 20, 2000, AGC contends that it had no reason to suspect that its injury was wrongfully caused. After it received Boeing's letter regarding the unenforceability of the Termination Agreement, AGC turned to Defendants for advice. AGC contends that Defendants advised it that Boeing's position was incorrect and that AGC should sue Boeing to enforce the Agreement. In addition, AGC contends that until November 2001, Defendants assured it that it would likely prevail in its litigation against Boeing.

      This Court finds insufficient support for departing from the general practice of viewing a discovery rule issue as a question of fact. The *Lucey* court further stated that "a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which the plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Lucey*, 301 Ill. App.3d at 356, 703 N.E.2d at 479. Here, AGC asserts that Defendants assured it that it would prevail in any litigation against Boeing. In addition, AGC contends that Defendants told AGC in March 1999 that the Termination Agreement would be enforceable. Taking all the evidence in the light most favorable to the non-movant, this Court finds that Defendants have fallen far short of showing that there is only one conclusion that can be drawn about when plaintiff should have realized his

injury was wrongfully caused. Thus, the claims relating to Defendants' March 1999 legal advice will be decided by the finder of fact.

### B.     Breach of Duty

In the instant case, it is uncontroverted that the AGC and Marsh and Ropes & Gray had an attorney/client relationship and that defendants owed plaintiff a duty because of that relationship. Whether defendants breached that duty to plaintiff, however, is a source of dispute. Plaintiff argues that Defendants breached their duty by giving legal advice that caused AGC to enter an unenforceable Termination Agreement and, ultimately, to file a losing lawsuit against Boeing. Defendants argue that the legal advice they gave was sound, and that it was Plaintiff's own actions, in disregard of Defendants' advice, that gave rise to the unenforceable Termination Agreement. Even if Defendants' conduct constituted a breach of their duty to AGC, plaintiff still must demonstrate that the attorneys' breach was the proximate cause of its damages.

### C.     Proximate Cause

To establish proximate cause in a legal malpractice case, the plaintiff must show that but for the attorney's negligence, he would not have suffered any injury. *Carmel v. Clapp & Eisenberg, P.C.*, 960 F.2d 698, 703 (7th Cir. 1992) (citing *Lamb v. Barbour*, 455 A.2d 1122, 1126, 188 N.J. Super. 6 (1982), *cert. denied*, 93 N.J. 297, 460 A.2d 693 (1983)). In addition, it is well established that a plaintiff client's failure to follow legal advice may constitute contributory negligence in a legal malpractice case. *Carmel*, 960 F.2d at 703.

AGC argues that it followed Defendants' advice[1] and that the Termination Agreement it entered was approved by Defendants. Thus, it asserts that Defendants are liable for the damages resulting from the District Court's determination that the Termination Agreement was the result of duress and therefore unenforceable. In support of this position, it contends that even if AGC had threatened to withhold shipments from Boeing, Defendants could have and should have suggested amendments to the Termination Agreement which would have effectively "cured" the threat and made the Agreement enforceable. For example, AGC argues that Marsh and Ropes & Gray could have and should have suggested amending the Termination Agreement to include language releasing and waiving all claims Boeing might have had based on Olson's March 15, 1999 phone call.

Defendants assert that they clearly told AGC, specifically Olson and O'Day, not to threaten to withhold shipments and that such a threat could be considered anticipatory repudiation of the contract. In direct violation of this advice, according to Defendants, Olson did threaten Boeing. However, O'Day testified in his deposition that he understood that AGC could not threaten Boeing because that might constitute breach of contract. Olson also testified that Marsh directed him to "preface all [my] remarks by saying 'I'm thinking about them.'" and not to say "[I'm] actually going to do it." Olson 2003 Dep., at 116. Defendants provided a draft letter for AGC to send to Boeing, which stated "[AGC] has made and will continue to make every

---

[1] Specifically, Olson contends that Marsh orally gave him a "script" during a phone call on March 15, 1999, and that he followed this script in his phone call to Boeing that same day. Marsh denies giving Olson a "script" and denies speaking with Olson at all on March 15, 1999. In any event, Olson and AGC have admitted that Olson threatened to stop shipments to Boeing during the March 15, 1999 telephone call.

effort to deliver parts on time while we remain under this contract." But the letter also contained a paragraph that read,

"If Boeing is more interested in preserving its contractual and legal rights than in receiving these parts on time, then it is on the right path. But, if Boeing is more interested in receiving timely shipments of parts than in going to court in an attempt to collect damages–from a small company struggling under a greatly-reduced and now one-sided contract–then it is on the wrong path." Marsh fax to O'Day, Mar. 1, 1999, at AGC0036.

This Court finds that Defendants have failed to establish that there are no genuine issues of material fact remaining in dispute. In fact, this Court finds that a reasonable factfinder could well determine that AGC followed Defendants' advice in its dealings with Boeing and that Defendants were the proximate cause of AGC's injury. A reasonable factfinder might well determine, however, that Defendants' advocated an aggressive approach but that AGC exceeded it when it threatened Boeing. The record before this Court, however, is insufficient to support Defendants' contention that, as a matter of law, it was not the proximate cause of AGC's damages.

Plaintiff also contends that Defendants' post-June 20, 2000 legal advice was the proximate cause of its decision to close its Chandler facility and thereby forego remaining contract payments and sales revenues. After Boeing's June 20, 2000 letter advising AGC that the Termination Agreement was unenforceable because of duress, Defendants provided advice to AGC on negotiating with Boeing for a potentially amicable settlement. AGC argues that it told Defendants it preferred to resolve matters with Boeing and did not wish to litigate. According to AGC, Defendants advised that Boeing was in breach of contract, that Boeing's duress argument

was weak, and that AGC would likely prevail in any eventual litigation. Thus, relying on Defendants' advice, AGC retained Lane Powell as local counsel, cancelled all its contracts with Boeing, and, because it no longer had any remaining purchase orders, shuttered its Chandler facility six months earlier than anticipated.

Defendants argue that AGC's decision to shutter the Chandler facility was based on an internal AGC business calculation that AGC's March 1999 threat to Boeing necessitated. In short, Defendants opine that AGC's threat rendered the Termination Agreement unenforceable and therefore led to the early closure of the Chandler facility. Moreover, Defendants contend that AGC failed to notify them of a July 21, 2000 settlement offer from Boeing which Defendants describe as substantially better than anything they had seen since the unenforceability notification. Defendants suggest they would have advised AGC to accept this offer and that AGC's failure to share it with them, despite faxing it to Lane Powell on the day it was received, necessitates summary judgment for Defendants.

This Court finds that summary judgment is inappropriate on this argument as well. Even supposing that AGC failed to share the July 21, 2000 offer from Boeing with Defendants, material issues about Marsh and Ropes & Gray's advice to AGC during the June-July 2000 efforts to negotiate with Boeing remain in dispute. In fact, Defendants do not deny that they advised AGC that Boeing's legal position was weak, or stated that if AGC was not satisfied with Boeing's offers, it should cancel its contracts and file suit to enforce the Termination Agreement.

Defendants' motion for summary judgment is denied. Taking all the evidence in the light most favorable to Plaintiff, this Court finds that multiple issues of material fact remain, including

questions as to the content of Marsh and Ropes & Gray's advice to AGC regarding the Termination Agreement and regarding AGC's response to Boeing's notice of unenforceability.

V. **COUNTERPLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

This Court now turns to Counterplaintiffs' Motion for Summary Judgment on Counterclaims I and II for breach of contract. Counterplaintiff Ropes & Gray alleges breach of contract against AGC for failure to pay legal fees relating to services Ropes & Gray rendered in relation to the contract. Counterplaintiff Marsh alleges breach of contract against AGC for failure to pay legal fees relating to services Marsh rendered as a sole practitioner regarding an unrelated AGC contract. The amount of unpaid legal fees is not in dispute. Both Marsh and Ropes & Gray allege that AGC has refused to pay for the services rendered, despite agreeing to do so. AGC asserts that any unpaid legal fees should be subject to set-off against an eventual judgment in AGC's legal malpractice case. Counterplaintiffs assert that they are entitled to summary judgment under applicable Illinois law because there is no statutory right of set-off. Moreover, Counterplaintiffs assert that AGC is not entitled to equitable set-off because it cannot show that the debt is mutual, mature, or liquidated, as required by equity.

AGC contends that any unpaid legal fees asserted are part of the damages AGC suffered in its malpractice case and therefore a set-off defense is appropriate. AGC opines that Defendants' neglect directly caused AGC's damages, and attorney's fees are recoverable. In addition, AGC argues that Marsh's counterclaim addresses fees incurred on work completely unrelated to the contract and subsequent litigation and does not comport with Federal Rule of Civil Procedure 13, which governs counterclaims and cross-claims. In any event, AGC contends that disposition of Marsh's counterclaim must wait until the legal malpractice complaint is

decided and can then be set-off against that judgment, if any. In the alternative, AGC suggests that enforcement of any judgment in favor of Counterplaintiffs should pending determination of AGC's legal malpractice claims for reasons of judicial economy.

Because the issues of breach of contract and setoff are inextricably intertwined with the underlying allegations of legal malpractice, this Court finds that Counterplaintiffs' motion for summary judgment is premature. This Court will bifurcate the Counterclaims and address them after the factfinder makes a determination on the liability issue on the legal malpractice claims. Counterplaintiffs' motion for summary judgment on counterclaims I and II is therefore denied.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied; Defendants' Motion to Strike is granted; and Counterplaintiffs' Motion for Summary Judgment is denied.

Enter:

/s/ David H. Coar
_____
David H. Coar
United States District Judge

Dated: **July 15, 2005**